UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

REENA MASELLI,

                                Plaintiff,

    v.                                        No. 17-CV-1913 (KMK)

TUCKAHOE UNION FREE SCHOOL           OPINION & ORDER
DISTRICT,

                                Defendant.

---

Appearances:

Jonathan Lovett, Esq.
Law Office of Jonathan Lovett
White Plains, NY
*Counsel for Plaintiff*

Lewis R. Silverman, Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

       Reena Maselli ("Plaintiff") brings this Action against the Tuckahoe Union Free School District ("District" or "Defendant"), alleging that the District violated her First Amendment right of intimate association with her brother-in-law. On September 27, 2018, the Court issued an Opinion & Order (the "Opinion") granting an initial motion to dismiss filed by Defendant. (Opinion (Dkt. No. 32).) Before the Court is Defendant's second Motion To Dismiss (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6). (Not. of Mot. (Dkt. No. 39).) For the following reasons, the Motion is granted.

## I.  Background

### A.  Factual History

The following allegations are drawn from the Second Amended Complaint and are taken as true for the purpose of resolving the instant Motion.

Plaintiff is a "highly qualified and experienced elementary school teacher." (Second Am. Compl. ("SAC") ¶ 3 (Dkt. No. 33).)  Plaintiff's parents died "[y]ears ago" and left "a de facto small nuclear family comprised of [herself], [her] sister Barbara, Barbara's husband David Pope [("Pope")], two nephews, a niece[,] and three other siblings of Plaintiff." (*Id.* ¶ 4.)  Plaintiff and Pope have "for years . . . enjoyed a very close personal and familial relationship." (*Id.* ¶ 5.)  In particular, Plaintiff alleges that "Pope has been like a brother to [her] for approximately twenty-five years[,] since she turned ten years old," (*id.* ¶ 6); that the above-mentioned family members have "on countless occasions spent holidays together at Pope's home," (*id.* ¶ 6(a)); that they "collectively celebrated their birthdays and other special events together at Pope's home, ate their meals together, routinely confided in each other . . . , and collectively made decisions as a family," (*id.* ¶ 6(b)); that they "went on yearly vacations (paid for by Pope) together for approximately twenty years[,] including travel to Disney World, the Hamptons, and New Jersey," (*id.* ¶ 6(c)); that they "collectively resided in Pope's house for five years[,] where he covered all expenses . . . and Plaintiff cared for his children," (*id.* ¶ 6(d)); that she "frequently and privately confided in Pope regarding decision-making with respect to college, marriage, graduate school, and her career," (*id.* ¶ 6(e)); and that she and Pope "privately shared their common thoughts, ideas, and beliefs regarding religion, politics, education, and other personal aspects of their lives," (*id.* ¶ 6(f)).  Plaintiff also alleges that she worked for Pope for "five years" in the past as an "[a]dministrative [a]ssistant." (*Id.* ¶¶ 5, 6(g).)  Finally, Plaintiff alleges that

## I.  Background

### A.  Factual History

The following allegations are drawn from the Second Amended Complaint and are taken as true for the purpose of resolving the instant Motion.

Plaintiff is a "highly qualified and experienced elementary school teacher." (Second Am. Compl. ("SAC") ¶ 3 (Dkt. No. 33).)  Plaintiff's parents died "[y]ears ago" and left "a de facto small nuclear family comprised of [herself], [her] sister Barbara, Barbara's husband David Pope [("Pope")], two nephews, a niece[,] and three other siblings of Plaintiff." (*Id.* ¶ 4.)  Plaintiff and Pope have "for years . . . enjoyed a very close personal and familial relationship." (*Id.* ¶ 5.)  In particular, Plaintiff alleges that "Pope has been like a brother to [her] for approximately twenty-five years[,] since she turned ten years old," (*id.* ¶ 6); that the above-mentioned family members have "on countless occasions spent holidays together at Pope's home," (*id.* ¶ 6(a)); that they "collectively celebrated their birthdays and other special events together at Pope's home, ate their meals together, routinely confided in each other . . . , and collectively made decisions as a family," (*id.* ¶ 6(b)); that they "went on yearly vacations (paid for by Pope) together for approximately twenty years[,] including travel to Disney World, the Hamptons, and New Jersey," (*id.* ¶ 6(c)); that they "collectively resided in Pope's house for five years[,] where he covered all expenses . . . and Plaintiff cared for his children," (*id.* ¶ 6(d)); that she "frequently and privately confided in Pope regarding decision-making with respect to college, marriage, graduate school, and her career," (*id.* ¶ 6(e)); and that she and Pope "privately shared their common thoughts, ideas, and beliefs regarding religion, politics, education, and other personal aspects of their lives," (*id.* ¶ 6(f)).  Plaintiff also alleges that she worked for Pope for "five years" in the past as an "[a]dministrative [a]ssistant." (*Id.* ¶¶ 5, 6(g).)  Finally, Plaintiff alleges that

Pope "provided financial assistance to [her] on numerous occasions[,] including covering some of her college expenses." (*Id.* ¶ 6(h).)

Pope has a son who attends a school in the District. (*Id.* ¶ 11.) At some unidentified date, Pope's son told him that "certain sports coaches employed by the District were not certified by the State," as required. (*Id.*) Pope complained to the District's interim superintendent, Charles T. Wilson ("Wilson"), about the issue. (*Id.* ¶¶ 8, 12.) Pope also told Wilson's secretary that he "would go public with his concern" if "Wilson failed to remedy the situation." (*Id.* ¶ 12.)

In early 2016, Plaintiff applied for a position as a fifth-grade teacher at the Cottle School, a school in the District. (*Id.* ¶ 14.) She was interviewed by a committee that included George Albano ("Albano"), the Cottle principal. (*Id.* ¶ 15.) Plaintiff was "unanimously selected . . . as the most outstanding candidate for appointment," and, in May 2016, Albano recommended Plaintiff's appointment to Wilson. (*Id.* ¶¶ 16–17.) Wilson, who did not know that Plaintiff was related to Pope, interviewed Plaintiff in June 2016. (*Id.* ¶¶ 17–18.) Following the interview, Wilson offered Plaintiff the position and "completed with her a 'Faculty Recommendation and Acceptance' agreement[,] which both he and Plaintiff then executed." (*Id.* ¶ 19.)

However, "shortly thereafter," Wilson was informed by Albano's son, the District's assistant superintendent, "that Plaintiff was a member of Pope's family." (*Id.* ¶ 20.) Wilson called Plaintiff and told her that they had hit "a bump in the road" because Pope "is controversial in the District." (*Id.* ¶ 21.) Wilson also told Albano that Pope is "toxic" and that Albano had "failed to inform [him] that Plaintiff was related to Pope." (*Id.* ¶ 23.) Ultimately, Wilson decided not to hire Plaintiff and instead hired a "lesser qualified" candidate. (*Id.* ¶¶ 22, 25–26.) Wilson "sought to justify his rejection of Plaintiff on," among other things, "the false premise that the selection process was 'flawed.'" (*Id.* ¶ 24.)

Plaintiff alleges that "Wilson's vindictive and retaliatory decision not to hire" her was "intended . . . to adversely affect and interfere with [her] relationship with Pope." (*Id.* ¶ 22.) Plaintiff further alleges that she (along with "her sister Barbara, Pope, and the other members of Plaintiff's family") has suffered "humiliation, embarrassment, anxiety, emotional upset, discomfort, anger, and outrage," and that "tension and intra-familial stress persisted for months." (*Id.* ¶¶ 27, 29.) She also alleges that she suffered "financial losses in the nature of salary and fringe benefits." (*Id.* ¶ 31.)

B. Procedural History

The initial Complaint was filed on March 15, 2017. (Compl. (Dkt. No. 1).) The First Amended Complaint was filed on June 13, 2017. (First Am. Compl ("FAC") (Dkt. No. 11).) On September 22, 2017, Defendant filed its first motion to dismiss and accompanying papers. (Dkt. Nos. 23, 24, 25.) Plaintiff filed a response on October 27, 2017, (Dkt. No. 27), and Defendant filed a reply on November 10, 2017, (Dkt. No. 30). On September 27, 2018, the Court issued the prior Opinion granting Defendant's motion and dismissing the First Amended Complaint without prejudice. (Opinion 13 (Dkt. No. 32).)

Plaintiff filed the instant Second Amended Complaint on October 25, 2018. (SAC (Dkt. No. 33).) On January 14, 2019, Defendant filed the instant Motion To Dismiss and accompanying papers. (Not. of Mot. (Dkt. No. 39); Decl. of Lewis R. Silverman, Esq. in Supp. of Mot. (Dkt. No. 40); Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 41).) Plaintiff filed a response in opposition on February 18, 2019. (Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 44).) On February 28, 2019, Defendant filed a reply. (Reply Mem. of Law in Supp. of Mot. ("Def.'s Reply") (Dkt. No. 45).)

II. Discussion

A. Standard of Review

The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Finally, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

B. Analysis

Plaintiff alleges that Defendant, acting via Wilson, improperly reneged on its decision to hire her because of her relationship with Pope, in violation of her First Amendment right of intimate association. (SAC ¶¶ 1, 33.)[1] Defendant argues that Plaintiff fails to allege the

---

[1] Plaintiff does not bring an intimate-association claim pursuant to the Fourteenth Amendment's Due Process Clause. *See Gorman v. Rensselaer County*, 910 F.3d 40, 47 (2d Cir. 2018) (noting that "[t]he Fourteenth Amendment guarantees a substantive right under the Due Process Clause to intimate familial association, including between siblings," and that "[a] claim for infringement of the right . . . requires conduct so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection" (citations and quotation marks omitted)). That is just as well, as a family member's claim that she suffered adverse action because of the conduct of another family member — as alleged here — "should be analyzed as a claimed violation of a First Amendment right of intimate association." *Kimble v. Kingston City Sch. Dist.*, No. 18-CV-575, 2019 WL 1259614, at *6 (N.D.N.Y. Mar. 19, 2019) (collecting cases); *see also Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999) ("[T]he New York action challenged here . . . seeks to penalize [the plaintiff] with loss of his job because of its displeasure with the conduct of his wife. If the First Amendment accords an individual some right to maintain an intimate marital relationship free of undue state interference, [the plaintiff's] claim properly invokes the protection of that Amendment.");

existence of a constitutionally protected relationship. (Def.'s Mem. 11–22.)[2]

    1. Applicable Law

"The [First Amendment] right to intimate association was first recognized by the Supreme Court in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)." *Matusick v. Erie County Water Auth.*, 757 F.3d 31, 57 (2d Cir. 2014). There, the Court held that "certain kinds of highly personal relationships" are entitled to protection "from unjustified interference by the State." *Roberts*, 468 U.S. at 618 (collecting cases). However, not all relationships are protected; there are "some relevant limitations on the relationships that might be entitled to . . . constitutional protection." *Id.* at 619. Clearly protected are those relationships involving "personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs" and "thereby foster[ing] diversity and act[ing] as critical buffers between the individual and the power of the State." *Id.* at 618–19 (collecting cases). These relationships include "those that attend the creation and sustenance of a family — marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Id.* at 619 (citations omitted). That is because "[f]amily relationships, by their nature, involve

---

*Harris-Thomson v. Riverhead Charter Sch. Bd. of Trs.*, No. 14-CV-5340, 2016 WL 11272084, at *13 (E.D.N.Y. Feb. 23, 2016) ("Familial association cases implicating First Amendment rights generally arise in the context of one party's exercise of the right to speak freely which is alleged [to] have resulted in adverse action against the named plaintiff-family member."), *adopted by* 2016 WL 4617207 (E.D.N.Y. Sept. 6, 2016). Only "[w]here the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns" — a situation not alleged or present here — do courts "employ[] an analysis under the framework of the Fourteenth Amendment right to substantive due process." *Garten v. Hochman*, No. 08-CV-9425, 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010) (collecting cases).

    [2] Defendant also argues that, even assuming a protected relationship, Plaintiff has not plausibly alleged facts showing an undue intrusion into that relationship. (Def.'s Mem. 21–24). Because the Court concludes that Plaintiff fails to plausibly allege a constitutionally protected relationship, it need not consider this argument.

7

deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* at 619–20. Such relationships "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620. Thus, the husband-wife relationship, as well as that between parents, siblings, and children, is recognized as warranting "the greatest degree of protection because they are among the most intimate of relationships." *Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002); *see also Berrios v. State Univ. of N.Y. at Stony Brook*, 518 F. Supp. 2d 409, 418 (E.D.N.Y. 2007) (noting that "the right of intimate association encompasses the husband/wife relationship . . . as well as the familial relationships between parents, siblings[,] and children" (citations omitted)); *Sutton v. Village of Valley Steam*, 96 F. Supp. 2d 189, 192–93 (E.D.N.Y. 2000) (holding that an adult son's relationship with his father was entitled to constitutional protection).

By contrast, non-familial relationships generally do not receive First Amendment protection. *See Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997) ("The Constitution does not recognize a generalized right of social association. The right generally will not apply, for example, to business relationships, chance encounters in dance halls, or paid rendezvous with escorts." (citations omitted)); *see also Michaelidis v. Berry*, 502 F. App'x 94, 96–97 (2d Cir. 2012) (holding that the relationship between the plaintiffs and "their landlords, their restaurant customers, and their employees [were] not sufficiently intimate to implicate [First Amendment] protection"); *Berrios*, 518 F. Supp. 2d at 421 (holding that a close working relationship between student and professor was not constitutionally protected); *Bates v. Bigger*, 192 F. Supp. 2d 160, 170 (S.D.N.Y. 2002) (holding that adulterous relationship between

8

coworkers was not constitutionally protected), *aff'd*, 56 F. App'x 527 (2d Cir. 2002).

However, the Supreme Court "h[as] not attempted to mark the precise boundaries of this type of constitutional protection." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). Rather, courts apply a "sliding scale for determining the amount of constitutional protection an association deserves," *Patel*, 305 F.3d at 136, and consider "such factors as cohabitation and the precise degree of kinship," *id.*, as well as "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship," *Rotary*, 481 U.S. at 546. This inquiry "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 620. "At the motion to dismiss stage, that assessment is necessarily premised upon the description of the relationship in the operative pleadings." *Stalter v. County of Orange*, No. 15-CV-5274, 2016 WL 8711397, at *8 (S.D.N.Y. Aug. 5, 2016).

### 2. Application

The relevant relationship alleged here is that between Plaintiff and Pope, Plaintiff's brother-in-law. (SAC ¶¶ 4–6.) The Second Circuit has not considered whether a sibling-in-law relationship is a familial relationship entitled to constitutional protection. The most recent Second Circuit decision to consider whether a relationship was constitutionally protected is *Matusick v. Erie County Water Authority*, 757 F.3d 31 (2d Cir. 2014). There, the court held that a non-marital intimate relationship was constitutionally protected because the couple was "involved in a long-term romantic relationship, held themselves out as engaged and were recognized as such, maintained together a relationship with [one partner's] children, and shared significant features of their private life together in anticipation of marriage." *Id.* at 58–59. The

9

court further noted that their relationship "was marked by the same characteristics of deep attachment, commitment, and self-identification that *Roberts* and its progeny have viewed as characteristic of constitutionally protected intimate association." *Id.* at 59.

In the prior Opinion, the Court held that, in contrast with *Matusick*, the allegations contained in Plaintiff's First Amended Complaint "[fell] short of describing the type of relationship that is afforded constitutional protection." (Opinion 11.) In particular, the Court held that Plaintiff offered several "naked assertions," and "provide[d] few details," about her relationship with Pope. (*Id.*) For example, "[w]hile Plaintiff . . . alleged that she and Pope lived together," she failed to specify "when and for how long the cohabitation lasted" or to "cite a single case suggesting that prior cohabitation in circumstances akin to those [alleged was] sufficient to justify constitutional protection." (*Id.*) Therefore, because Plaintiff did not "allege[] how her relationship with Pope [was] based on the 'creation and sustenance of a family,'" or "how she and Pope share[d] not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of [their lives]," the Court held that Plaintiff failed to plausibly allege that the relationship between her and Pope was entitled to constitutional protection. (*Id.* (quoting *Roberts*, 468 U.S. at 619–20).)

Defendant argues that Plaintiff's Second Amended Complaint fails to correct the deficiencies previously identified by the Court. (Def.'s Mem. 11–22.) The Court agrees. As an initial matter, it bears acknowledging that the Second Amended Complaint provides somewhat more information about Plaintiff's relationship with Pope than did the First Amended Complaint. Specifically, Plaintiff alleges that, following her parents' death, there remained a "de facto small nuclear family comprised of" Plaintiff, Plaintiff's sister, Pope, "two nephews, a niece, and three other siblings of Plaintiff"; that Plaintiff and Pope have "for years enjoyed a very close personal

10

and familial relationship"; that "Pope has been like a brother to Plaintiff for approximately twenty-five years[,] since she turned ten years old"; that they have spent "countless . . . holidays," as well as "birthdays and other special events," at Pope's home; that they "collectively resided in Pope's house for five years[,] where he covered all expenses" and "Plaintiff cared for his children"; that they "went on yearly vacations (paid for by Pope) together for approximately twenty years[,] including travel to Disney World, the Hamptons, and New Jersey"; that they "ate their meals together, routinely confided in each other," and "collectively made decisions as a family"; that Plaintiff consulted Pope "with respect to college, marriage, graduate school, and her career"; that they "privately shared their common thoughts, ideas, and beliefs regarding religion, politics, education, and other personal aspects of their lives"; that Plaintiff worked for Pope as an "[a]dministrative [a]ssistant" for "five years"; and that Pope provided Plaintiff with "financial assistance . . . on numerous occasions[,] including covering some of her college expenses." (SAC ¶¶ 4–6.)

Yet, as before, these allegations lack critical factual details necessary for the Court to plausibly conclude that Plaintiff and Pope — who are not married, romantically involved, or biologically related — currently maintain a relationship meriting constitutional protection. Although Plaintiff alleges that she and Pope lived together (along with Pope's wife (Plaintiff's sister) and other members of her sister's family) for a five-year period, Plaintiff fails, as before, to explain when that period was, or, critically, whether they lived together at the time of the events giving rise to this case. Similarly, although Plaintiff alleges that she "cared for [Pope's] children" when they lived together, and that they "collectively made decisions as a family," Plaintiff fails to particularize those allegations — there is no explanation as to what that childcare consisted of or what major decisions were collectively made. Nor does Plaintiff

11

explain, for example, when she worked for Pope, what the details of that employment relationship were, what portion of her college expenses were allegedly covered by Pope, or when that (or other) financial assistance occurred. In fact, as Defendant points out, it is not even clear from the Second Amended Complaint that Plaintiff and Pope *currently* "see each other or communicate with each other on a regular basis." (Def.'s Mem. 3.)

Put differently, on the non-specific facts contained in the Second Amended Complaint, Plaintiff has failed to plausibly allege that, *at the time of the events giving rise to this case*, she and Pope maintained a relationship based on "the creation and sustenance of a family," such as the "raising and education of children" or the "co-habitation with one's relatives." *Roberts*, 468 U.S. at 619. Nor has Plaintiff alleged facts suggesting that she and Pope "select[ed]" each other or that "others [were] excluded from critical aspects of the[ir] relationship." *Rotary*, 481 U.S. at 546. The Court does not doubt that Plaintiff and Pope have had a long-lasting and close relationship. However, as noted above, not all close relationships are protected. *See Sanitation & Recycling*, 107 F.3d at 996 ("The Constitution does not recognize a generalized right of social association."). Although the relationship between familial siblings has been recognized as constitutionally protected, *see Patel*, 305 F.3d at 136 (holding that "the relationships at issue in this case — those between [the plaintiff] and his father, siblings, wife, and children — receive the greatest degree of protection because they are among the most intimate of relationships"); *Miron v. Town of Stratford*, 976 F. Supp. 2d 120, 147–48 (D. Conn. 2013) ("The sibling relationship is one recognized as warranting protection." (citing, inter alia, *Patel*, 305 F.3d at 136)); *but see Mann v. City of Sacramento*, 748 F. App'x 112, 114–15 (9th Cir. 2018) (holding that adult, non-cohabitating familial siblings did not sufficiently allege an intimate relationship warranting constitutional protection), this Court has not located, and Plaintiff has not offered,

12

*any* case in which a sibling-*in-law* relationship has been found to warrant constitutional protection (let alone one in which a plaintiff did not allege current cohabitation). Indeed, as the Court previously noted, (Opinion 12), the only opinion to consider the issue, *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988), declined to afford a sibling-in-law relationship constitutional protection. There, the Third Circuit concluded that, although the plaintiff had alleged facts suggesting that she and her brother-in-law were "good friends," their relationship "was neither 'selected' nor bound by blood," and, accordingly, the plaintiff did not allege facts suggesting "their relationship . . . was based on the 'creation and sustenance of a family.'" *Id.* at 1204–05 (quotation marks omitted) (citing *Roberts*, 468 U.S. at 619). Plaintiff has entirely failed to engage with *Rode*. (*See generally* Pl.'s Mem.) In any event, Plaintiff does not plausibly allege that her relationship with Pope was, at the time of the events giving rise to this case, more than that of "good friends." *Rode*, 845 F.2d at 1204. Therefore, given the conspicuous lack of precedent, the Court declines to hold, on the non-specific facts alleged in the Second Amended Complaint, that Plaintiff's relationship with Pope is entitled to First Amendment protection. *See id.*; *see also Gross v. City of Albany*, No. 14-CV-736, 2015 WL 5708445, at *10 (N.D.N.Y. Sept. 29, 2015) (holding that "friendships, however close, are insufficient to state a claim under the First Amendment" (citations omitted)); *Silverstein v. Lawrence Union Free Sch. Dist.*, No. 10-CV-993, 2011 WL 1261122, at *6–7 (E.D.N.Y. Feb. 15, 2011) (holding that "a platonic friendship, even a long standing one of great intimacy," was not entitled to constitutional protection), *adopted by* 2011 WL 1261114 (E.D.N.Y. Mar. 30, 2011); *Rodriguez v. Bd. of Trs. for State Colls. & Univs.*, No. 92-CV-2448, 1994 WL 693431, at *4 (E.D. La. Dec. 8, 1994) (finding no constitutionally protected relationship between player and coach where the plaintiff testified that their relationship was "great" and that the coach was a "mother figure" and

"mentor," because "bonds between 'good friends' not based on the 'creation and sustenance of a family,' are not included within the constitutionally protected freedom of association" (quoting *Rode*, 845 F.2d at 1205)), *aff'd*, 66 F.3d 320 (5th Cir. 1995).

Accordingly, Plaintiff's intimate-association claim fails.

### III. Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is granted. The Second Amended Complaint is dismissed in its entirety. Dismissal is with prejudice.[3] The Clerk of the Court is respectfully requested to terminate the pending Motion, (Dkt. No. 39), and to close this case.

SO ORDERED.

DATED: July 30, 2019
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[3] Although Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be "freely give[n] . . . when justice so requires," the decision is "within the sound discretion of the district court," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), which may "deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *id.* A complaint may be dismissed with prejudice where the pleading be dismissed without prejudice if the pleading has "substantive" problems and "[a] better pleading will not cure [them]." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The Court concludes that Plaintiff, who is counseled, has "no right to a [third] amendment — a [fourth] bite at the apple — particularly where, as here, [she] had ample opportunity to craft [her] complaints and [was] advised by the Court, prior to amending . . . , of certain pleading deficiencies and what the Court would require." *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 390 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005). "There is no reason to suspect that, given another opportunity to amend, Plaintiff[] will be able to cure the substantive deficiencies" identified. *Estate of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 433 (S.D.N.Y. 2017). Accordingly, the Court dismisses the Second Amended Complaint with prejudice. *See Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where the plaintiff "already had one chance to amend his [c]omplaint, and there [was] still no indication that a valid claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016).

14